20062

Bobby HOFFMAN, Respondent, v. Graylon DIXON, Appellant
(217 S. E. (2d) 29)

*James M. Herring, Esq.,* of *Corish, Smith, Remler & Moore,* Hilton Head Island, *for Appellant,*

*Messrs. Floyd & Craig,* of Hartsville, *for Respondent,*

July 15, 1975.

BUSSEY, Justice:

The plaintiff-respondent Hoffman and the defendant-appellant Dixon were the sole owners of a corporation known as Hartsville Dry Wall and Supply, Inc. Hoffman brought this action seeking a declaratory judgment, as to certain matters, but primarily an accounting as to what sums of money he owed the corporation and as to monies he claimed due him by the corporation. The cause was heard by the court below by consent of the parties, without a jury, as a cause in equity and the same is similarly treated on appeal to this Court. We do not question the analysis of counsel as to the nature of the case. The appellant Dixon contended that Hoffman was indebted to the corporation in the amount of $17,688.46, but the trial court concluded such indebtedness to be only $6,784.38 and Dixon appeals.

The background facts of the case are as follows. Hoffman, for a number of years, has been engaged in dry wall construction doing business as Hoffman Dry Wall. Dixon was a full-time employee of Sonoco, but at some time prior to the year 1971 became a co-owner with one George Waldon in a business known as Hartsville Glidden. Hoffman was a substantial customer of Hartsville Glidden and about September, 1971 was indebted to Hartsville Glidden in an accumulated amount of slightly more than $10,000.00. Waldon wished to take his son into the business and for that reason desired to sever his relationship with Dixon in the operation of Hartsville Glidden. It wat at this time that Dixon and Hoffman determined to form a corporation known as Hartsville Dry Wall and Supply, Inc. In forming the corporation each contributed the sum of $10,000.00, but inferentially Hoffman was not in a position to put up his $10,000.00 and also pay the $10,000.00 which he owed

Glidden with the result that Dixon agreed with Waldon to take the Hoffman-Glidden account as an asset upon dissolution of the Waldon-Dixon ownership of Glidden. As a result this left Hoffman owing Dixon slightly more than $10,000.00 personally.

Although the parties obtained a charter for Hartsville Dry Wall and Supply, Inc., they apparently never put in writing anything as to the operation of the corporation or as to the respective duties or obligations of the two owners. In any event the corporate business took over construction contracts which Hoffman either already had or was negotiating for some apartment buildings, and supplies for these contracts were furnished by the corporate enterprise. In addition, some supplies were sold to other contractors in the dry wall business and a lot of supplies were sold to Hoffman for use in the conduct of his individual business which he continued under the name of Hoffman Dry Wall. What is here involved is the amount of money due by Hoffman doing business as Hoffman Dry Wall, to Hartsville Dry Wall and Supply, Inc.

The corporation owned by the parties never had a place of business. Supplies were purchased by the corporation and stored in an old mercantile building belonging to Hoffman and used in part by the corporation as a warehouse. Only Hoffman and Dixon had keys to such warehouse. All of the material sold out of the warehouse to customers other than Hoffman was sold only when either Dixon or Hoffman was present, and either paid for in cash or accounted for. When Hoffman and/or his employees withdrew supplies from the warehouse most of the time Dixon was not there and no one made any record of supplies withdrawn by Hoffman. According to Dixon's testimony it was agreed that Hoffman's withdrawals were to be determined each month by computing the beginning inventory, plus new merchandise placed in the warehouse during the month, and deducting from these totals the cash or signature sales to

other customers plus the end of the month inventory. The balance or difference was debited to Hoffman since only he and his men had unlimited access to the merchandise and no one but Hoffman or Dixon made third party sales. There was under the counter in the warehouse a small metal box with a snap lock on it, and according to Dixon, each month he placed in the metal box, by agreement with Hoffman, a statement showing how much Hoffman owed. Dixon further testified that he assumed that Hoffman had picked up the statements from the box as they would be gone when Dixon would place one there for another month.

Hoffman denied the agreement about placing the statements in the metal box and denied that he had ever gotten a statement therefrom. He admitted, however, that he constantly withdrew materials in the absence of Dixon without making any record thereof and that he had never asked Dixon for any statement.

The corporation continued in business for approximately 12 months during which time Hoffman made nine payments to the corporation on account of supplies withdrawn by him. Each of his nine checks was for even dollar amounts ranging from $1,200.00 to $3,000.00. Inferentially, he made no payment during three of the months that the corporation was in business. It is clear from the evidence that at least some of these payments were made to avoid bank overdrafts by the corporation, but the evidence is in conflict as to whether all of them were so made.

It was not until June, 1972 that Dixon asked Hoffman for the $10,000.00 which was personally owed to Dixon and which Dixon then needed. Such amount was paid, according to Dixon, in September, 1972, and it is clearly inferable that such payment put a strain on Hoffman's finances as he was paying a debt which he had owed more than a year and at a time when, according to him, his business was not as good as it had been the preceding year. The business arrangement between the parties came to an end as of September 30, 1972, and it is of some significance, we

think, that Hoffman in his verified complaint asserted various claims against the corporation which he could not, however, substantiate by evidence, all such being disallowed by the court below. Had such claims been allowed his indebtedness to the corporation would have been reduced to an amount not greatly in excess of what he admitted owing.

Hoffman testified that he did not believe that he owed the corporation more than about $4,000.00 on open account and told his accountant that he didn't believe he owed over $4,000.00 to $5,000.00. He admittedly, however, had no record of any kind and the record rather clearly shows that he had no clear idea as to how much he had paid on account. According to his testimony he had dry wall contracts for about 300 houses during the year 1972, but his dollar volume was somewhat less than in 1971 when his contracts totalled about half a million dollars. During the year that the corporation was in business Hoffman bought materials from other suppliers as well and the record rather suggests that he had no clear idea as to how much he had bought or from whom. Indeed, he furnished no underlying facts whatever to support his estimate as to the amount owed by him to the corporation. The lower court nevertheless fixed the amount of the indebtedness at $5,000.00, such being the outside figure admitted by Hoffman to his accountant and added to such sum the value of the inventory remaining in the warehouse when Hoffman assumed sole control thereof, resulting in a finding that Hoffman's total indebtedness to the corporation was $6,784.38.

On the other hand Dixon apparently kept and offered in evidence a meticulous record of what was owed based on the inventory system he testified they had agreed to. Hoffman denies any such agreement but does not testify there was any other agreement as to how the corporation would determine what he owed for supplies withdrawn by Hoffman and his employees without any record being made thereof. It would be utterly incredible to suppose that the parties intended that Hoffman's indebtedness to the corpo-

ration be determined merely by his estimates, made from time to time, as to how much material and supplies he had withdrawn.

The evidence rather clearly discloses, we think, that Dixon trusted and befriended Hoffman and there is nothing whatever in the record we think, from which any inference could be drawn that Dixon in any manner tried to over-reach Hoffman in any way.

In an appeal in an equity case the Supreme Court has jurisdiction to find the facts in accord with its view of the preponderance of evidence and may reverse findings below when an appellant establishes that they are without evidentiary support or against the clear preponderance of the evidence. See numerous cases collected in West's South Carolina Digest, Appeal and Error, Key 1009(2)(4). In our view the clear weight and preponderance of the evidence in this case is to the effect that Hoffman is indebted to the corporation, Hartsville Dry Wall and Supply, Inc., in the sum of $17,688.31 and the lower court should have so held. Indeed, we do not find that the record contains any credible evidence to the contrary.

The judgment below is reversed and the cause remanded for entry of judgment in accordance with the views herein expressed.

Reversed.

Moss, C. J., and LEWIS, LITTLEJOHN and NESS, JJ., concur.